UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NACOLE DAVIS | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 3:06-CV-0883-B |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security,[1] | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b) and the order of the District Court filed on May 22, 2006, the subject cause has previously been referred to the United States Magistrate Judge. The findings, conclusions, and recommendations of the Magistrate Judge, as evidenced by his signature thereto, are as follows:

Procedural History: On July 29, 2002, Plaintiff filed an application for Supplemental Security Income ("SSI") benefits alleging disability due to depression and diabetes. (Administrative Record 62-65, 73 [Hereinafter Tr.].)

The Administrative Law Judge ("ALJ") conducted a hearing on May 21, 2004.[2] On June 24, 2004, the ALJ denied Plaintiff's request for SSI benefits, finding that she was not disabled because she retained the residual functional capacity ("RFC") to perform her past relevant work. (Tr. 267-72.)

---

[1] Effective February 12, 2007, Michael J. Astrue was named the Commissioner of Social Security. The caption is being changed pursuant to Fed. R. Civ. P. 25(d).

[2] The transcript from this hearing is not included in the record.

Plaintiff timely requested a review of the ALJ's decision by the Appeals Council, and on March 11, 2005, the Appeals Council granted Plaintiff's request, vacated the decision of the ALJ and remanded her claim for further proceedings due to an inaudible hearing tape and a potentially incomplete record. (Tr. 277-78.)

A second administrative hearing was held on August 9, 2005. (Tr. 345-85.) On October 28, 2005, the ALJ denied Plaintiff's request for SSI payments, finding that she retained the RFC for a significant range of light work and was capable of making a successful adjustment to work existing in significant numbers in the national economy. (Tr. 13-21.) Plaintiff again requested review by the Appeals Council but the Appeals Council denied her request on April 18, 2006. (Tr. 5-7.) Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review. *See Masterson v. Barnhart*, 309 F.3d 267, 271 (5th Cir. 2002).

Plaintiff filed her federal complaint on May 16, 2006. Defendant filed an answer on July 26, 2006. On September 29, 2006, Plaintiff filed a brief followed by Defendant's brief on January 26, 2007. Plaintiff filed a reply brief on February 9, 2007.

Standard of Review–Social Security Claims: When reviewing an ALJ's decision to deny benefits, the scope of judicial review is limited to a determination of: (1) whether the ALJ's decision is supported by substantial evidence in the record and (2) whether the proper legal standards were applied in evaluating the evidence. *Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). In determining whether

substantial evidence exists, the court reviews the entire record, but does not reweigh the evidence, retry the issues, or substitute its own judgment. *Id.* at 1022 (citations omitted). Where the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971)).

Discussion:

To prevail on a claim for SSI benefits, a claimant bears the burden of establishing that he or she is disabled, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). Substantial gainful activity is defined as "work that [i]nvolves doing significant and productive physical or mental duties; and [i]s done (or intended) for pay or profit." § 416.910.

The ALJ uses a sequential five-step inquiry to determine whether a claimant is disabled. *See* § 416.920. Under the first four steps, a claimant has the burden of proving that her disability prevents her from performing her past relevant work, but under the fifth step, the burden shifts to the Commissioner to prove that there is other substantial gainful activity that the claimant can perform. *See, e.g.*, *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S. Ct. 2287, 2294 (1987); *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

In this case, the ALJ proceeded to step five and determined that Plaintiff retained the capacity to perform a significant range of light work and that she could perform jobs existing in substantial numbers in the national economy. (Tr. 20.) He therefore denied Plaintiff's request

for SSI benefits. (Tr. 20-21.)

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because he failed to give controlling weight to the medical opinions of her treating doctors and failed to appropriately consider the opinion of one of the two state agency psychologists, Dr. S. A. Somodevilla., Ph.D., who evaluated her.

Plaintiff's history of mental health treatment was thoroughly discussed by the ALJ in his opinion. In brief, Plaintiff sought mental health treatment at the Telecare NorthStar Clinic on July 2, 2002. (Tr. 151-52.) Dr. Shivani Myer, M.D., diagnosed her with major depressive disorder, recurrent, severe, without psychotic features, and assigned a Global Assessment of Functioning ("GAF") score of 35.[3] (Tr. 151-52). On November 18, 2002, Dr. Dale General, Ph.D., evaluated Ms. Davis at the behest of Texas Rehabilitation Commission and diagnosed her with major depressive disorder, recurrent, in partial remission, and gave her a GAF score of 68.[4] (Tr. 156-59.) At the time of his evaluation, Plaintiff reporting taking several psychiatric medications (Tr. 158.) A little over one year later, on December 16, 2003, Plaintiff was seen and evaluated by Dr. Somodevilla. (Tr. 161-64.) After administering several diagnostic exams, Dr. Somodevilla diagnosed Ms. Davis with major depressive disorder, recurrent, and assigned a

---

[3] A GAF score between 31 and 40 indicates that a person suffers "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") at 34.

[4] A GAF score bewteen 61 to 70 indicates that a person has "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

GAF score of 55.[5]  (Tr. 163.) Plaintiff reported that she was still taking several medications for depression and anxiety. (Tr. 161.) Following the examination, Dr. Somodevilla completed a form entitled, "Medical Assessment of Ability to Perform Work-Related Activities (Mental)" and opined, in pertinent part, that Plaintiff had a poor ability to: deal with the public; deal with work stress; and understand, remember and carry out complex job instructions. (Tr. 165-66.)

On September 14, 2004, Plaintiff was evaluated at the Telecare NorthStar clinic by Janice Sloan, an adult practice nurse, who diagnosed her with major depressive disorder, recurrent, severe, without psychotic features, and assigned a GAF score of 38. (Tr. 309-10). At the time of this evaluation, Plaintiff reported that she had not been taking her medications for approximately one year. (Tr. 309.) On February 14, 2005, an advanced practice nurse at Dallas MetroCare Services, Cheryl Tibbets, diagnosed Plaintiff with major depressive disorder, severe, recurrent, with psychotic features, and assigned her a GAF score of 45.[6] (Tr. 315-16). Ms. Tibbets saw Plaintiff four more times during 2005 and noted mild improvement in her symptoms at each visit. (Tr. 312-25.) Following the initial appointment, Plaintiff never again reported suffering from hallucinations, delusions or other psychotic features. (Tr. 314.) On May 23, 2005, Ms. Tibbets noted that Plaintiff had been responsibly taking her medications for depression. (Tr. 312.)

At the administrative hearing held on August 9, 2005, Dr. Alvin Smith, Ph.D., a clinical

---

[5] A GAF score between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

[6] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

psychologist, was called as the psychological medical expert ("ME") and summarized the medical evidence in the record. (Tr. 362-77.) He opined that Plaintiff did not have a mental impairment that met or equaled a listing. (Tr. 366.) He stated that the medical evidence supported a diagnosis of major depressive disorder that was recurrent and severe when Ms. Davis was not receiving treatment and that was recurrent, mild to moderate and in partial remission when she was receiving treatment. (Tr. 366.) He testified that, when taking her medication, she experienced mild functional limitations in activities of daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence and pace. (Tr. 368.) When she was not on medication, she had moderate limitations in activities of daily living and marked limitations in maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 368-369.)

Plaintiff argues that the ALJ was required to give controlling weight to the opinions of Dr. Myer, Ms. Sloan and Ms. Tibbets that Plaintiff had a severely impaired level of functioning, as evidenced by the low GAF scores they assigned to her.[7] Under the regulations, a medical opinion regarding the nature and severity of a claimant's impairment from a source who has regularly treated the claimant, i.e. a "treating source," should be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic

---

[7] Plaintiff argues that her low GAF scores conclusively establish that she is unable to perform substantial gainful activity. However, federal courts have declined to find such a strong correlation between an individual's GAF score and the ability or inability to work *See, e.g., Heinritz v. Barnhart*, No. 05-5208, 2006 WL 2294850, at *3 (10th Cir. Aug. 10, 2006) (agreeing with a magistrate judge's finding that "GAF scores are not considered absolute determiners of disability"); *Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1200 (E.D. Mo. 2004) ("In the absence of any evidence indicating that Dr. Leonberger assigned this GAF score [50] because he perceived an impairment in plaintiff's ability to work, the score, standing alone, does not establish an impairment seriously interfering with plaintiff's ability to perform basic work activities").

techniques and not inconsistent with the other substantial evidence in the record. § 416.927(d). However, Ms. Sloan and Ms. Tibbets, as nurses, are not considered "treating sources" who are qualified to render medical opinions and their opinions, however relevant, are not entitled to *controlling* weight. See §§ 416.913(a), (d); 416.927(d). Although Dr. Myer might qualify as a "treating source" because she treated Plaintiff on more than one occasion,[8] (Tr. 151-53), the ALJ was permitted to give her opinions less than controlling weight because they are contradicted by competing first-hand medical evidence.[9] *See* § 416.927(d); s*ee also Walker v. Barnhart*, 158 Fed. Appx. 534, 535, 2005 WL 3340251, at *1 (5th Cir. 2005) (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)). Both consultative examiners assigned Plaintiff GAF scores significantly higher than the score assigned by Dr. Myer–Dr. General assigned Plaintiff a GAF score of 68, which is associated with mild functioning limitations and Dr. Somodevilla assigned her a GAF score of 55, which is associated with moderate functional impairments. Moreover, Plaintiff demonstrated improving symptoms over the course of her treatment with Ms. Tibbets. Therefore, the ALJ's determination that Plaintiff's depression was mild to moderate with

---

[8] Defendant argues that Dr. Myer should not be characterized as a "treating psychiatrist" because: (1) Plaintiff was seen by her only two times and (2) there is no evidence that she is a psychiatrist. The undersigned does not address this argument because, regardless of whether Dr. Myer is considered an "examining" or a "treating" physician, her medical opinions are contradicted by other first-hand evidence in the record.

[9] The ALJ did not discuss Ms. Tibbets's treatment notes in his opinion. While the record must demonstrate that an ALJ considered all of the evidence in the record, an ALJ is not required to discuss every piece of evidence. *See, e.g.*, *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). In this instance, Ms. Tibbet's medical notes indicate that Plaintiff's condition improved with medication. (Tr. 312-14.) These observations are consistent with the testimony of the ME, Dr. Smith, who indicated that Plaintiff experienced milder functional limitations when taking her medication. (Tr. 366-69.) Therefore, the ALJ did not commit reversible error by failing to discuss the notes of Ms. Tibbets. *See Brown ex rel. Brown v. Commissioner of Social Sec.*, 311 F. Supp. 2d 1151, 1160-61 (D. Kan. 2004) (finding no error in an ALJ's failure to mention a doctor's report where the report was consistent with other evidence in the record).

treatment is supported by substantial evidence.

Likewise, Plaintiff argues that Dr. Somodevilla's determination that her ability to handle work-related stress was poor prevented the ALJ from finding at step five that she was capable of performing jobs that existed in substantial numbers in the economy. At the administrative hearing the VE opined that an individual who had an almost absent ability to handle work-related stress would not be able to find work. (Tr. 381.) However, the ALJ was not required to accept the VE's opinion. *See, e.g., Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985) (noting that an ALJ may disregard a VE's response to a hypothetical question if the ALJ finds that the evidentiary assumptions behind the hypothetical are not supported by the record). Although Dr. Somodevilla found that Plaintiff's ability to deal with stress in the workplace was poor, he nevertheless assigned her a GAF score of 55, which is suggestive of only moderate difficulty in occupational functioning. And as noted by the ALJ, Plaintiff reported to Dr. General that she was able to perform all duties involved in running her household, could travel in unfamiliar places, and did not experience difficulty in relating to people in authority–comments which are suggestive of an ability to manage stress. (Tr. 15.) Furthermore, Dr. Smith opined that Plaintiff–when taking her medication–experienced only mild to moderate functional limitations. Thus, based on the totality of the evidence in the record, the ALJ was entitled to disregard the VE's answer to the hypothetical question regarding Plaintiff's ability to handle stress in the workplace.

Next, Plaintiff argues that the ALJ's step five decision is flawed because he failed to give adequate consideration to her diabetic condition and its effect on her ability to perform work-related activities. In response to questioning by Plaintiff's attorney, the VE testified that a person

who had to lie down over the course of the day would not be able to perform the jobs of office helper, mail room clerk and kitchen food assembler. (Tr. 380.) Plaintiff argues that the evidence in the record supports the evidentiary assumption that, due to her diabetic condition, she needs to lie down throughout the workday. However, she does not identify any treating physician who prescribed or suggested such a regimen. She merely: (1) refers the court to one medical record from April 22, 2005, indicating that Plaintiff was suffering leg pain and diagnosing her with "possible" diabetic neuropathy, (Tr. 303); (2) cites her own administrative hearing testimony wherein she stated that she experiences elevated blood sugar levels and related fatigue approximately four to five times per week which leads her to lie down for 30 minute periods of time, (Tr. 358-59), and (3) cites the testimony of the ME Dr. Sterling Moore who stated that–although the effect of changes in blood sugar varies from individual to individual–high blood sugar can lead to fatigue. (Tr. 365.) The ALJ did not include in Plaintiff's RFC a limitation that she be permitted to lie down for 30 minutes at a time. As stated *supra*, he was permitted to disregard the VE's response to the hypothetical question if he found that the evidentiary assumptions behind the hypothetical were not supported by the record. *See Owens*, 770 F.2d at 1282. In this instance, the ALJ duly noted that a consultative examiner, Dr. Lige Rushing, M.D., found Plaintiff's diabetes did not affect her ability to stand and walk. (Tr. 17, 171.) The ALJ further noted the absence of any restriction from working in any of Ms. Davis's medical records. (Tr. 17.) Consequently, due to the lack of medical evidence supporting Plaintiff's assertion that she needed to lie down throughout the workday, the ALJ's decision to omit this limitation from Plaintiff's RFC is supported by substantial evidence.

       Finally, Plaintiff argues that the ALJ's step five decision is flawed because he determined

that Plaintiff was capable of performing the jobs of kitchen food preparer (DOT[10] No. 319.484-010), mail clerk (DOT No. 209.687-026) and office helper (DOT No. 239.567-010). Plaintiff's argument as it applies to the jobs of kitchen food preparer and mail clerk has merit. The ALJ's decision that Plaintiff was capable of performing the kitchen food preparer position–which is classified as semi-skilled work–conflicts with his finding that she had a limited education and no transferable skills. *See* SSR 83-10, 1983 WL 31251, at *3 (S.S.A. 1982) ("Ability to perform skilled or semiskilled work depends on the presence of acquired skills which may be transferred to such work from past job experience above the unskilled level or the presence of recently completed education which allows for direct entry into skilled or semiskilled work").

Likewise, the job of mail room clerk requires a reasoning development level of 3, which requires a worker to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and to "[d]eal with problems involving several concrete variables in or from standardized situations." DOT, App. C, Components of the Definition Trailer. Because the ALJ accepted Dr. Smith's administrative hearing testimony that Plaintiff was limited to following simple or detailed instructions, (Tr. 18, 376), it was erroneous for him to likewise find that Plaintiff was capable of performing a job with a reasoning development level of 3. *See Trebilcock v. Barnhart*, No. 04-18-P-S, 2004 WL 2378856, at *3 (D. Me. Oct. 24, 2004) (noting that "a person capable of carrying out... 'occasionally detailed' instructions seemingly would be incapable of performing a job with a GED reasoning level of 3").

However, the remaining job identified by the VE–office helper–has a specific vocational preparation ("SVP") level of 2, which the Social Security Administration classifies as unskilled

---

[10] United States Department of Labor's Dictionary of Occupational Titles, Appendix C (4th Ed. 1991) ("DOT").

work, and a reasoning development level of 2, which the Social Security Administration defines as requiring a worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations. *See* SSR 82-41, 1982 WL 31389, at *2-4 (S.S.A. 1982) (describing the SVP levels for unskilled, semi-skilled and skilled work); DOT, App. C., Components of the Definition Trailer. The VE testified that approximately 160,000 office helper positions existed in the national economy and 10,000 existed at the state level. (Tr. 378-79.) Therefore, despite the fact the evidence supports Plaintiff's ability to perform only one of the original three jobs listed by the VE, the undersigned finds that the ALJ's step five finding is nevertheless supported by substantial evidence because a significant number of office helper positions exist in the national and local economy. *See Mercer v. Halter*, No. Civ.A.4:00-CV-1257-BE, 2001 WL 257842, at *6 (N.D. Tex. Mar. 7, 2001) (noting that the question of whether work exists in significant numbers "has been left to the trial judge's common sense in the face of the statutory language and a particular fact situation").[11]

**RECOMMENDATION:**

For the forgoing reasons, it is recommended that the District Court enter its order

---

[11] Plaintiff alleges in a conclusory statement that "the ALJ improperly applied the vocational rules of Appendix 2." Pl.'s Brief 13. To the extent that this argument relates to the ALJ's findings regarding Plaintiff's capability to work in the three aforementioned positions, the argument has already been addressed. If Plaintiff's statement is interpreted as an argument that the ALJ improperly relied on the Grid Rules, it is equally without merit, as he used them as a framework for his decision in accordance with 20 C.F.R. pt. 404, subpt. P, App. 2, § 200.00(e)(2).

AFFIRMING the decision of the Commissioner and DISMISSING this action with prejudice  A copy of this recommendation shall be transmitted to counsel for the parties.

Signed this 3rd day of July, 2007.

Wm. F. Sanderson Jr.
UNITED STATES MAGISTRATE JUDGE

NOTICE

In the event that you wish to object to this recommendation, you are hereby notified that you must file your written objections within ten (10) days after being served with a copy of this recommendation.  Pursuant to *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996)(*en banc*), a party's failure to file written objections to these proposed findings of fact and conclusions of law within such ten (10) day period may bar a *de novo* determination by the district judge of any finding of fact and conclusion of law and shall bar such party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and conclusions of law accepted by the district court.